UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
Evans Ganthier,

                Petitioner,                **MEMORANDUM & ORDER**
                                                23-CV-414 (NRM)

      -against-

Superintendent,
Green Haven Correctional Facility

                Respondent.
---------------------------------------------------------------x

**NINA R. MORRISON**, United States District Judge:

      In this action, a petition for writ of habeas corpus under 28 U.S.C. § 2254, Petitioner Evans Ganthier seeks relief from a conviction imposed after he was convicted by jury verdict of murder in the second degree and sentenced to an indeterminate prison term of 25 years to life. Ganthier alleges, among other things, that the state court unreasonably applied federal law when it rejected his claim that admission of an autopsy report over his objection violated his rights under the Confrontation Clause in the Sixth Amendment to the United States Constitution, because the author of that report was not produced for cross-examination at trial. For the reasons that follow, the petition is GRANTED with respect to his Confrontation Clause claim. Ganthier's conviction is VACATED, and his case is REMANDED for a new trial.

**<u>OVERVIEW</u>**

In September 2013, Petitioner Evans Ganthier was convicted upon jury verdict of murder in the second degree in the County Court of Suffolk County. *People v. Ganthier*, 149 N.Y.S.3d 225, 227 (N.Y. App. Div. 2021). He was subsequently sentenced to an indeterminate term of 25 years to life in prison.

The crime of conviction occurred in December 2009, after Rebecca Koster died in Ganthier's presence. At trial, the defense denied that Ganthier killed Koster or otherwise caused her death. However, in pretrial interviews with police, Ganthier admitted that — in what he claimed was a panicked effort to avoid being wrongly accused of murdering Koster — he tried to obscure the identity of Koster's corpse, by cutting off certain identifying features after she died and attempting to burn her remains. For these reasons, the central dispute at trial was Koster's cause of death. The prosecution alleged Koster died by stab wounds inflicted by Ganthier while she was still alive. By contrast, Ganthier argued that Koster was intoxicated, slipped and fell in his garage, and died from an apparent head injury shortly thereafter, and that all the knife wounds identified at autopsy were inflicted post-mortem.

After Koster's body was discovered, investigation led law enforcement to Ganthier; fingerprints from duct tape used to bind Koster's body matched Ganthier's prints, video from a bar showed Koster speaking with Ganthier that day, and phone records showed that Ganthier called Koster that day and disconnected his phone during the time Koster had disappeared. Police arrested Ganthier, and he agreed to be interviewed. Ganthier admitted to cutting parts of Koster's body and burning her

remains but denied killing her.  He told police that Koster started gagging and foaming at the mouth while in his car, and that when they arrived at his home, she then tripped in his garage and began bleeding profusely.  He claimed that he then carried her back to his car and began driving her to the hospital, but when she died in his car along the way, he panicked, worrying about what would happen if he, a Black man, arrived at the hospital with the body of a deceased white woman.  He then cut parts of her body to conceal her identity and burned her remains.

Despite these admissions, law enforcement dropped the charges initially brought against Ganthier and released him on December 15, 2009 — pending the outcome of Rebecca Koster's autopsy.  In January 2010, Dr. Ira Kanfer of the Connecticut Office of the Medical Examiner completed the autopsy, concluding that the final cause of Koster's death was a "stab wound of [the] abdomen" and the final manner of death was "homicide."  In February 2010, Ganthier was re-arrested and charged with Koster's murder.

Dr. Kanfer's autopsy report became the centerpiece of Ganthier's trial.  But even though Dr. Kanfer  was still employed as an associate medical examiner at the time of trial, he did not testify about his findings.  Instead, the prosecution offered the surrogate testimony of his former supervisor, Dr. Harold Wayne Carver, who formed his opinions based on the findings and observations in Dr. Kanfer's autopsy report.  Dr. Carver testified that Koster suffered five sharp force injuries while alive, including a stab wound to the liver and four wounds to the neck.  He further interpreted the x-rays in Koster's autopsy materials as showing a "C" shape that

3

indicated that air was sucked in due to the neck injuries, making them fatal. Ganthier objected to this testimony and to the admission of Dr. Kanfer's report, arguing that presenting such evidence without affording him the right to cross-examine Dr. Kanfer violated the Sixth Amendment's Confrontation Clause.

The Court agrees.  This result is compelled by well-settled Supreme Court caselaw that predated Ganthier's trial, particularly *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), and *Bullcoming v. New Mexico*, 564 U.S. 647 (2011).  And it is further guided by the Second Circuit's more recent application of those same precedents in *Garlick v. Lee*, 1 F.4th 122 (2d Cir. 2021).  In *Garlick,* an autopsy report prepared at the request of law enforcement was admitted over the defendant's Confrontation Clause objection through a witness who had not participated in the autopsy nor in preparation of the autopsy report.  *Id.* at 125.  The Second Circuit held that admission of the report over the defendant's objection was an unreasonable application of clearly established federal law as determined by the United States Supreme Court and granted habeas relief.

Here, as in *Garlick*, admission of Dr. Kanfer's report through Dr. Carver's testimony, over the objection by Ganthier, clearly violated the Confrontation Clause. Moreover, the error was not harmless.  The cause of Koster's death was the primary issue in dispute at trial, and the prosecution relied heavily on Dr. Kanfer's report, whose findings were presented in detail through Dr. Carver's testimony, to prove its case in chief and discredit Ganthier's alternative theory of Koster's death.

Ganthier also raises ineffective assistance of counsel claims for certain alleged failures of his trial counsel, including, in particular, counsel's decision not to call a retained former Suffolk County chief medical examiner as an expert witness in support of his theory that Koster died accidentally. Because the Court grants relief from Ganthier's conviction under the Confrontation Clause, however, it does not reach his ineffective assistance of counsel claims.

## FACTUAL AND PROCEDURAL HISTORY

### I. Koster's Death

In the early morning hours of December 4, 2009, petitioner Evans Ganthier and the young woman he was eventually convicted of murdering — 24-year-old Rebecca Koster — met at a bar in Patchogue, New York called Butcher Boys. Tr. 8/1/2013, 441:13–25, ECF No. 7-27.[1] Prior to arriving at Butcher Boys, Koster had smoked marijuana with a friend at Koster's home, Tr. 7/30/2013, 227:17–23, ECF No. 7-25, and later at a bar called Kelly's Bar, she consumed a shot of tequila and two glasses of wine. *Id.* at 232:6–16. Koster left Kelly's Bar and drove with her boyfriend and two friends to Butcher Boys, where they arrived at 2:15 a.m. Tr. 8/1/2013, 381:1–19; Tr. 7/30/2013, 293:4–7. At Butcher Boys, Koster walked over to Ganthier, the two began talking and laughing, and they eventually exchanged phone numbers. Tr. 8/1/2013, 441:13–25; *see also* Tr. 7/30/2013, 295:8-10.

---

[1] Pincites for trial transcripts refer to the internal pagination of those transcripts. All other pincites refer to the pagination generated by the Official Court Electronic Document Filing System (CM/ECF).

Video recordings from Butcher Boys' security system showed Koster exiting the bar at 3:03 a.m.  Tr. 7/30/2013, 294:1–5.  One of the friends who drove her to Butcher Boys drove her home, with another friend and Koster's boyfriend Dan Mayer in the car.  Tr. 8/1/2023, 389:2–7.  Ganthier left Butcher Boys in a separate vehicle. *Id*. at 389:8–14.  Koster arrived home at approximately 3:30 a.m. *Id*. at 391:5–7.  The friend who drove Koster home testified that Koster appeared fine, whereas Mayer testified that Koster was "a little wobbly" and that he helped her to her door.  Tr. 8/1/2013, 391:10–12; Tr. 8/26/2013, 1266:20–1267:5, ECF No. 7-40.

It is undisputed that later that night, Ganthier drove to Koster's home, picked her up in his car, and began driving her to his home.  *See* Tr. 8/19/2013, 984:7–12, ECF No. 7-36.  What happened next — specifically, whether Ganthier stabbed Koster to death, or whether she died accidentally in his presence after falling and sustaining a serious head injury — was the issue the jury was asked to resolve at Ganthier's murder trial.

In a series of voluntary interviews with police detectives after Koster's body was found on December 4, 2009, Ganthier gave the following account.  According to Ganthier, as he drove, Koster suddenly began to "gag" and "foam from the mouth." Tr. 8/20/2013, 3:20–23, ECF No. 7-37.[2]  He drove her to his home to get her a glass of

---

[2] Ganthier did not testify at trial.  However, he waived his *Miranda* rights and gave a series of voluntary interviews to detectives after Koster's body was found. Detective Philip Frendo testified about many of Ganthier's statements at trial.  *See* Tr. 8/19/2013, 962:1–963:25.  Ganthier's trial defense — that Koster died accidentally in his presence, and that he altered her corpse and attempted to conceal her death out of a "panicked" fear he would be wrongfully accused of killing her — was

water, but as they were walking through his garage, Koster tripped on dumbbells, hit her head on the concrete garage floor, and began bleeding from her head. *Id*. at 3:23–4:6, 7:22–23. Ganthier carried her into his car and began driving to the hospital, but Koster died along the way. *Id*. at 8:4–8.

Ganthier told detectives that he "panicked," terrified of what would happen if he, a Black man, arrived at the hospital with the body of a deceased white woman. Tr. 8/20/2013, 10:13–17. Ganthier claimed he then drove back to his house, washed his hands, and ultimately wrapped Koster's body in plastic and in a gray photo backdrop. *Id*. at 8:9–22. He placed her body in the back of his truck, drove to the Port Jefferson Ferry, and took the ferry to Connecticut. *Id*. at 8:22–9:1.

Ganthier then took a number of gruesome steps to try and conceal Koster's identity. He cut off Koster's toes, fingertips, hair, piercings, and tattoos. Tr. 8/20/2013, 16:9–17:6. After staying briefly at a motel, he found a dark road, placed Koster's body on the side of the road, and lit it on fire. *Id*. at 10:21–11:15. He then drove back to New York. *Id*. at 11:13–16.

Koster's family filed a missing persons report on December 4, 2009. Tr. 7/30/2013, 334:19–335:14, 356:23–357:2. While Koster was still believed to be missing, Ganthier noticed that he had received a series of messages on his own phone from people asking about Koster, and he realized her family had his phone number. Tr. 8/20/2013, 13:4–9. To "point the focus in a different direction," Ganthier, who had

---

consistent with his pretrial statements to detectives about Koster's death and his subsequent actions. *See id*. at 984:8–985:10.

taken possession of Koster's phone, texted Koster's mother from Koster's phone, pretending to be Koster herself and claiming that Koster's boyfriend, Dan Mayer, was essentially holding Koster captive. *Id*. at 13:9–15, 28:11–19. Ganthier then broke Koster's phone and discarded the pieces around Long Island. *Id*. at 13:15–17, 28:20–22. Ganthier also bought cleaning supplies and paint and cleaned and painted his garage, including in the area where he claimed Koster had fallen and bled from her head. *Id*. at 12:5–17, 28:20–24.

## II. Charges and Initial Arrest

Koster's body was eventually found on the evening of December 4, 2009. At approximately 7:15 p.m., a man observed a fire as he turned onto a road in Connecticut. Tr. 7/24/2013, 108:1–109:4, ECF No. 7-21. When he realized it appeared to be a human body in flames, he called 911. *Id*. at 110:9–111:17. A resident trooper arrived on the scene around 7:26 p.m., and afterward, the fire chief arrived. Tr. 7/25/2013, 124:10–14, 128:3–7; 130:3–17, ECF No. 7-22.

According to the trooper, "it was obvious it was a death that needed to be investigated, something that major crime would typically investigate." Tr. 7/25/2013, 141:4–7. The trooper told the fire chief to extinguish the fire but cautioned him that it was a crime scene so that the fire chief would be weary of damaging evidence. *Id*. at 130:3–131:2. The Connecticut Eastern District Major Crime Unit then "took over responsibility for the investigation." *Id*. at 140:2–11. Staff from the Connecticut Office of the Chief Medical Examiner ("OCME") arrived and removed the decedent's body at 12:15 a.m. the next morning. *Id*. at 162:13–163:9. The autopsy occurred that

day, December 5, 2009, with detectives present.  Tr. 7/26/2013, 24:4–24, ECF No. 7-23.  One of these detectives explained at trial that his "function at the morgue that day" was "to collect evidence."  *Id.* at 24:22–24.  Ultimately, dental records identified the body as Koster's.  *People v. Ganthier*, 149 N.Y.S.3d 225, 227 (N.Y. App. Div. 2021); Tr. 8/8/2013, 485, 945, ECF No. 7-31; *see* Mem. of Law in Support of Pet. ("Pet'r Mem.") 5, ECF No. 4.

After further investigation — which included an analysis of fingerprints on duct tape used to bind Koster's body being matched to Ganthier, Tr. 7/31/2013, 52:17–21, 54:14–23, 59:1–60:12, ECF No. 7-26, and video from Butcher Boys showing Koster speaking with Ganthier early in the morning on December 4, 2009, Tr. 7/30/2013, 290:4–295:10; Tr. 8/19/2013, 950:21–23 — Ganthier was arrested on December 14, 2009 around 8:30 a.m. on charges related to Koster's murder.  Tr. 8/19/2013, 957:21–25.  Ganthier waived his Fifth Amendment privileges and was interviewed at length by police.  *Ganthier*, 149 N.Y.S.3d at 227.  The next day, however, December 15, 2009, police dropped the charges against Ganthier and released him.  Tr. 8/20/2013, 51:3–4.  At trial, Detective Frendo explained that the murder charges against Ganthier were "withdrawn"; Detective Frendo's supervisor instructed him to withdraw the charges because "[t]he Connecticut Medical Examiner's Office, they were waiting for their toxicological results before they made a final determination of the cause and manner of death."  *Id.* at 50:24–51:18.

### III. Autopsy and Report

Dr. Ira J. Kanfer, M.D., Associate Medical Examiner for the Connecticut OCME, performed Koster's autopsy on December 5, 2009, and issued his final autopsy report in January 2010. Autopsy Report 1–5, ECF No. 14. Initially, Dr. Kanfer listed the cause of death and manner of death as "pending." *Id.* at 5. He then amended his report on January 19, 2010, to list the final cause of death as "stab wound of abdomen" and the final manner of death as "homicide." *Id.*

In the report, Dr. Kanfer set forth an array of detailed observations and scientific findings from his examination of Koster's body. These included, *inter alia,* a section on "evidence of injury":

> There is a stab wound of the left lobe of the liver, which is approximately 1.5 cm in greatest dimension. Associated with the stab wound is approximately 200 cc of fluid blood in the abdominal cavity. In addition, there are four defects of the neck with no underlying hemorrhage of the soft tissues and no injury to the vital organs of the neck. The toes and fingers are not identified and there is burning of the distal extremities. The nose and ears are not identified.

Autopsy Report at 1. Under his observations of Koster's head and brain, Dr. Kanfer wrote that "[t]here is no evidence of subdural or subarachnoid collections of blood. There is no evidence of skull fracture." *Id.* at 2. He noted the specimens taken for toxicological analysis, *id.* at 3, and listed his "Autopsy Findings" as "multiple sharp force injuries." *Id.* at 4.

Under his finding of the final manner of death, Dr. Kanfer certified that "[t]his is a true statement of the postmortem findings upon the body of Rebecca Eladia Koster," signing the form with the date January 19, 2010. Autopsy Report at 5. The autopsy report materials also included a toxicology report dated January 13, 2010,

*id.* at 6, a receipt of evidence sheet indicating that a detective received three pieces of evidence from the autopsy performed on December 5, 2009, *id.* at 8, as well as photographs and an x-ray taken. *See* Resp't letter dated 1/16/2025, submitting photos and an x-ray under seal, ECF No. 15. The autopsy file also included a dental identification completed by Dr. Kanfer's colleague, Chief Medical Examiner Dr. Harold Wayne Carver, finding that the body belonged to Koster. Autopsy Report at 7.

## IV. Ganthier's Rearrest

On February 8, 2010, after the final autopsy report was completed, Ganthier was rearrested and charged with Koster's murder. Tr. 8/20/2013, 58:23–59:6, 60:16–23.

Ganthier again agreed to be interviewed by the police, and provided additional details about what he claimed had occurred on the night Koster died and his own actions in the days that followed. *See* Tr. 8/20/2013, 67:7–72:4; Tr. 8/21/2013, 4:14–15:17. The interrogating officer told Ganthier that, according to the Connecticut OCME, Koster did not have head injuries that could have caused her death, that she was negative for drugs that would have caused her death, and that the cause of death was a stab wound to her liver, Tr. 8/20/2013, 69:14–21. Yet Ganthier denied stabbing Koster while she was alive, and also denied inflicting any post-mortem knife wounds in the area of her liver. *Id*. at 69:22–70:18. He told police that while he was cutting off Koster's hair, the point of the knife went into her neck, but that he did not intend to cut her neck. Tr. 8/21/2013, 13:10–18, ECF No. 7-38. He stood by his claim that

11

Koster had, after having gagged and foamed at the mouth in his car, tripped on 50-pound dumbbells in Ganthier's garage and hit her head, and that he began to drive her to the hospital while she was still alive but that she died along the way. *Id.* at 8:14–9:19. He maintained that he "panicked" and drove back to his house with her corpse, but that he did not kill her. *Id.* at 9:22–23. He further insisted that he only used a knife to cut Koster's body post-mortem, when he tried to cover up her death, and that he had not stabbed her nor inflicted any other sharp injuries to her while she was alive. *Id.* at 9:22–23, 12:15–13:21, 15:18–23.

## V. Trial

Ganthier's jury trial began on July 9, 2013. *See* Tr. 7/9/2013, ECF No. 7-13. At trial, there was no dispute that Ganthier was the last person to see Koster alive on December 4, 2009; that she died in his presence; and that he took extensive measures to cover up her death and deflect suspicion from himself in the days that followed. Instead, the disputed issues for the jury to resolve were Koster's actual cause and manner of death.

The prosecution argued that Koster died from stab wounds to her neck and liver, inflicted by Ganthier. *See, e.g.,* Tr. 8/28/2013, 18:9–11, ECF No. 7-43. The defense argued that the People had failed to prove that any of Koster's stab wounds were pre-mortem injuries inflicted by Ganthier, and that the cause of death was actually blunt force trauma — consistent with Ganthier's claim to police that Koster tripped and fell in his garage, and that the "stab wounds" to Koster's neck cited by prosecutors were actually post-mortem injuries from Ganthier's panicked efforts to

12

conceal the identity of Koster's corpse.  *See, e.g.,* Tr. 8/27/2013, 1309:18–19, 1385:23–1395:6, ECF No. 7-41.

## A. Initial Discussion of Autopsy Report During Trial

Counsel for both parties initially discussed the People's intent to admit Dr. Kanfer's autopsy findings through the testimony of a surrogate witness on August 8, 2013.  On that date, Assistant District Attorney Janet Albertson indicated that she intended to call the Connecticut Chief Medical Examiner, Dr. Harold Wayne Carver, as the People's sole witness regarding the autopsy performed on Rebecca Koster's remains.  *See* Tr. 8/8/2013, 465:13–17.  However, Dr. Carver had neither attended nor performed the autopsy; his role in the pretrial investigation into Koster's death was limited to conducting a dental identification.  *Id*. at 465:14–21.

Dr. Kanfer, the Associate Medical Examiner who actually performed the autopsy and authored the final report, was still employed at OCME at the time of Ganthier's trial.  *See* Tr. 8/8/2013, 536:21–538:4.  While the state court record is not clear as to Dr. Kanfer's availability to testify, there are some indications in the record that he may have scheduled a vacation[3] during some portion of Ganthier's

---

[3] ADA Albertson told the trial court that Dr. Kanfer was on vacation "for a lot of the month" of August.  Tr. 8/23/2013, 1239:17-24.  However, Dr. Carver, who was employed by the Connecticut OCME on a retiree per diem basis and had served as the Chief Medical Examiner just two weeks prior to his testimony, Tr. 8/8/2013, 469:8–17, testified that he did not know of any vacation that Dr. Kanfer had scheduled in August 2013.  *Id.* at 536:21-538:4.

approximately seven-week-long trial.[4]  There is no indication in the record, however, that Dr. Kanfer was ever asked to (re)schedule his vacation to accommodate the trial schedule, nor whether the People ever sought to reset the trial date to permit Dr. Kanfer to testify if he had a conflict.  *See* Tr. 8/23/2013, 1239:17–20, ECF No. 13. Instead, ADA Albertson simply informed the Court that she intended to elicit Dr. Carver to "lay[ ] a business record foundation for the autopsy report and the autopsy findings" by Dr. Kanfer and to offer his own opinions, based on what he reviewed in the autopsy file, as to Koster's cause and manner of death.  Tr. 8/8/2013, 465:14–466:24.

Prior to calling Dr. Carver, Albertson briefly summarized for the record portions of a prior, unrecorded exchange between counsel and the trial court regarding the autopsy report and Dr. Carver's surrogate testimony.  (At oral argument before this Court on January 14, 2025, counsel for Petitioner and Respondent agreed that this exchange occurred at some unknown earlier point in time, and was likely done in the trial judge's chambers without a court reporter present.)  Outside the presence of the jury, Albertson stated that "[t]he case law, [as] I believe we have already discussed, in New York is clear that there is no hearsay" issue with admitting the autopsy report in Dr. Kanfer's absence, provided that a foundation is laid to show that the autopsy report is a "business record."  Tr. 8/8/2013,

---

[4] Jury selection began on July 9, 2013, and the parties gave their opening statements on July 24, 2013.  Tr. 7/9/2013, 7:3–8:8 (beginning of jury selection); Tr. 7/24/2013, 32:11–14 (beginning of opening statements).  The jury issued its verdict on August 29, 2013.  Tr. 8/29/2013, 1556:7–14, ECF No. 7-44.

465:22–466:8. Albertson also asserted that the Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004), posed no barrier to the admission of the report even if Dr. Kanfer was not produced for cross-examination; she asserted that under "the case law" virtually the entire autopsy report could come in as "a business record," as long as "the opinion of the pathologist who did the autopsy" was redacted. Tr. 8/8/2013, 466:9–15. She also maintained that a surrogate OCME witness such as Dr. Carver could testify to his own opinions based on the "factual record" in the report. *Id*. at 466:12–15. Again referencing the earlier, unrecorded chambers discussion, Albertson stated that Ganthier's "counsel would prefer, while he has no objection to [Dr. Carver's] testimony coming in, that the reports not be admitted into evidence, but they can obviously be referred to for their factual material." *Id*. at 466:16–21.

Albertson concluded by informing the trial court that she would be offering photographs and x-rays taken by Dr. Kanfer into evidence but would not seek to admit the autopsy report itself — and would instead have Dr. Carver testify about the so-called "factual" findings in the report. Tr. 8/8/2013, 466:25–467:10; *see also* Tr. 8/23/2013, 1240–1241 (in subsequent exchange over defense objection to admission of autopsy report, Albertson references a prior "lengthy discussion" during which "counsel for the defense did not want the autopsy report to go into evidence," but ultimately "agreed upon review of the case law that, as did the Court, that [sic] it would be admissible and the witnesses could testify from the facts therein").

**B. Dr. Carver's Testimony and Admission of the Full Autopsy Report**

At trial on August 8, 2013, the prosecutor laid a foundation for the admission of Dr. Kanfer's autopsy report — through Dr. Carver — as a business record. Tr. 8/8/2013, 483:15–484:12. She then proceeded to elicit extensive testimony from Dr. Carver about the findings and observations that Dr. Kanfer had made during the autopsy, as well as his own scientific opinions based on Dr. Kanfer's report, photographs, and x-rays. *Id.* at 484:13–485:5. For example, Dr. Carver testified that Dr. Kanfer had identified a "stab wound" to the left of Koster's midline that was inflicted while she was alive, and that this particular stab wound caused injury to her liver. *Id.* at 491:19–492:3. Dr. Carver "knew that the wound to the liver occurred when [Koster] had a beating heart" because Dr. Kanfer's autopsy revealed that the wound "bled into the belly cavity." *Id.* at 492:16–18.

Dr. Carver further testified that Dr. Kanfer's autopsy had identified four stab wounds to Koster's neck area. Tr. 8/8/2013, 492:9–14, 493:24–494:1. The x-ray in the autopsy file showed "air in the right side of the heart," which Dr. Carver described as "a rare but very bad complication of cutting the veins in the neck." *Id.* at 493:10–13. The air that Dr. Carver observed in the right side of Koster's heart in the x-ray, showed up as a "dark C-shaped mark," what "radiologists call . . . a C sign." *Id.* at 494:2–495:2. That air, according to Dr. Carver, can ultimately stop blood circulation and cause death. *Id.* at 493:18–23.

Dr. Carver could not determine whether the liver stab wound or the neck stab wounds identified in the autopsy occurred first, "[b]ecause the one to the liver didn't bleed a great deal into the belly cavity." Tr. 8/8/2013, 495:7–12. In Dr. Carver's view,

16

the apparent stab wound to the liver would be a fatal injury if not treated, even if Koster did not have stab wounds to the neck. *Id.* at 496:14–18. The injuries to Koster's neck could be fatal due to the sucking in of air Dr. Carver discussed earlier. *Id.* at 496:23–497:9. Dr. Carver also relied heavily on the autopsy findings to rebut the defense's theory that Koster died from accidental blunt force trauma. He told the jury that, per the autopsy, there was no indication that Koster had suffered a significant head injury. *Id.* at 497:10–498:11. He then opined that a head injury did not cause or contribute to Koster's death. *Id.* at 498:12–15.

Moving to the toxicology portion of the autopsy materials, Dr. Carver testified that the "basic drug screen" included in Dr. Kanfer's autopsy report came back negative. Tr. 8/8/2013, 501:18–22. In that screen, the toxicology lab associated with the medical examiner's office had tested for drugs including cocaine, morphine, heroin, opiate painkillers, synthetic painkillers, "almost all of the antidepressant medications and the anti-psychotic medications," and "some of the heavy-duty tranquilizers." *Id.* at 499:9–14, 500:23–501:11.

After a break during Dr. Carver's direct examination, the Court addressed Ganthier's trial counsel on the record, stating, "before the doctor testified there was an agreement between the parties that the autopsy written report would not go into evidence. You have a different application on that point now?" Tr. 8/8/2013, 504:11–23. Defense counsel stated, "Based upon the testimony of this witness, who did not conduct the autopsy, had nothing whatsoever to do with it other than the dental identification, I'm asking that the entire autopsy report with the toxicology report go

17

into evidence." *Id*. at 504:24–505:5.  Upon the prosecutor's consent, the trial court admitted the full report into evidence.  *Id*. at 506:12–24.

On cross-examination, Dr. Carver testified that he did not review the individual procedures in the toxicology that was completed, only the reported results. Tr. 8/8/2013, 546:22–23.  Dr. Carver acknowledged that Dr. Kanfer's report stated that there were no soft tissue injuries from the defects to Koster's neck and that Dr. Carver's theory about the potential link between the wounds to her neck area and the cause of her death came from Dr. Carver's interpretation of the x-rays included in Dr. Kanfer's autopsy file.  *Id*. at 576:13–577:10.  Dr. Carver also acknowledged that Dr. Kanfer, according to his autopsy report, did not document any disease in nor injuries to Koster's heart.  *Id*. at 580:15–581:13.  He further acknowledged that the liver injury documented by Dr. Kanfer could be interpreted as a fracture instead of a stab wound.  Tr. 8/9/2013, 620:2–14, ECF No. 7-32.

On re-direct examination, Dr. Carver was asked to elaborate on the basis for his opinion that Koster was stabbed in her liver area.  He explained that, in his view, a stab wound could have reached Koster's liver without harming other organs if Koster was bent over when stabbed, Tr. 8/9/2013, 657:11–658:2, and that his opinion remained that the injury to her liver was a sharp force, not blunt force, injury.  *Id*. at 659:11–660:11.  However, on re-cross examination, Dr. Carver acknowledged that he

could not rule out the possibility that the liver injury documented by Dr. Kanfer was caused by blunt force trauma rather than a sharp instrument. *Id*. at 672:12–18.

### C. Confrontation Clause Objection

After Dr. Carver testified, but before the jury was charged, defense counsel William J. Keahon lodged a formal objection to the admission of the autopsy report and to Dr. Carver's surrogate testimony. He informed the Court, "My client has asked me to indicate to the Court that he believes his constitutional rights have been violated because they never produced Dr. Kanfer, who did the autopsy and is the individual that claims that there was a stab wound to the abdominal area." Tr. 8/23/2013, 1238:10–16.

ADA Albertson did not argue that the defendant's objection had been waived by his counsel's earlier concessions. Instead, she responded, "[T]hat's not a violation of the defendant's constitutional rights. The autopsy report is a business record and was admitted to the Court as such and it stands on its own." Tr. 8/23/2013, 1238:22–1239:1. According to Albertson, the prosecution was "under no obligation in and of itself to produce . . . [D]octor [Kanfer]." *Id*. at 1239:2–5. And "[w]ith regard to *Crawford* [*v. Washington*]," "I think the law is clear, and we discussed it in chambers and I produced the case law regarding those issues. *And in New York it is still that an autopsy is considered a business record* and as long as the appropriate foundation is laid, which it was, it is admissible as such." *Id*. at 1239:25–1240:7 (emphasis supplied). Albertson noted that, before Dr. Carver testified about the report and before the autopsy report was admitted into evidence, she "had produced the

appropriate case law and said that the record should go into evidence with the opinion of the autopsy and doctor redacted, the opinion of cause and manner of death," which "is not part of the business record." *Id*. at 1240:8–17. The prosecutor explained, "[w]hat makes it a business record essentially is the factual material that is contained in the autopsy and the accompanying autopsy files, photographs and x-rays." *Id*. at 1240:18–21. Again referencing an earlier, "lengthy discussion" in the judge's chambers on the issue, the prosecutor stated that "counsel for the defense did not want the autopsy report to go into evidence as a business record, but agreed upon review of the case law that, as did the Court, that it would be admissible and the witnesses could testify from the facts therein." *Id*. at 1240:21–1241:2. Ganthier's trial counsel responded that he felt constrained to make this earlier concession because, as he then understood the law, "I had no legal basis to make an objection to prevent that autopsy report from going in and I wanted, once it was going in, I wanted it to go in as a complete document because it was totally in contrast to Dr. Carver's testimony in major respects. I make this application today because my client requested that I do." *Id*. at 1241:14–21.

On August 26, 2023, the trial court denied the defense's Confrontation Clause objection on the merits. *See* Tr. 8/26/2013, 1246:17–20 ("The defendant's application claiming a denial of his constitutional rights as a result of People's failure to call Dr. Kanfer is denied."). The court "agree[d] with the People that they have complete discretion in who they will prove . . . their case with and what witnesses they will use to do that." *Id*. at 1245:22–1246:1. The Court further noted that "the autopsy report

in this case was admitted as a business record subject to the redaction of the medical examiner's opinions concerning cause and manner of death." *Id.* at 1246:3–7.  In the trial court's view, "[u]nder such circumstances the autopsy report was admitted under a recognized exception to the hearsay rule and did not violate the defendant's right to confrontation." *Id.* at 1246:7–11.

### D. Summation and Verdict

In his closing, Ganthier's counsel told the jury that "[t]here's one [disputed] issue in this case.  It's cause of death." Tr. 8/27/2013, 1309:18–19.  Defense counsel devoted an extensive portion of his time to the details of Dr. Carver's testimony on both direct and cross-examination.  *See* Tr. 8/27/2013, 1306:18–1308:22, 1310:15–1311:9, 1311:22–1312:17, 1313:21–1319:1, 1337:14–1339:15, 1348:22–1350:4, 1372:22–1401:22; Tr. 8/28/2013, 1413:9–1470:16, 1471:23–1473:18, ECF No. 7-42.[5] He repeatedly urged the jury to find at least reasonable doubt based on the evidence that the wound to Koster's liver may have been from blunt force trauma, not from a stab wound. *See, e.g.,* Tr. 8/27/2013, 1401:1–22; Tr. 8/28/2013, 1438:16–19.  And he repeatedly attacked as flawed the opinions Dr. Carver had offered about an apparent stab wound to Koster's liver, and about the neck wound(s) that Dr. Carver tied to an allegedly fatal air bubble in Koster's heart.  *See, e.g.,* Tr. 8/27/2013, 1306:8–12, 1306:17–25, 1380:6–18.

---

[5] The transcript for Ganthier's trial on August 28, 2013 is split into two parts and comprises two separate ECF filings.  ECF Nos. 7-42, 7-43.  The pagination for the first transcript is from pages 1403–1531, ECF No. 7-42, and the pagination for the second transcript is from pages 1–58.  ECF No. 7-43.  The trial transcript for August 29, 2013 resumes with its pagination beginning on page 1532.  ECF No. 7-44.

The defense also argued that it was "impossible" for a knife to enter Koster's abdomen in the location identified in the autopsy and proceed to injure her liver without also lacerating or cutting other organs in Koster's body along the path to her liver.   Tr. 8/27/2013, 1317:13–1318:15.   Trial counsel challenged Dr. Carver's explanation for the absence of such injuries in Dr. Kanfer's autopsy report, *i.e.,* Dr. Carver's claim that the organs along the path to the liver could "move around" and remain unharmed.   *Id*. at 1318:16–23.   Finally, the defense invoked various procedures that, counsel claimed, should have been followed by Dr. Kanfer while performing the autopsy but were not.  *See, e.g., id*. at 1395:12–20.

In the People's summation, the prosecutor also relied heavily on the autopsy report and Dr. Carver's testimony to prove its theory as to cause and manner of death: that Koster died, not from a drug overdose and/or injuries during a fall, but from stab wound(s) inflicted by Ganthier while she was alive.  *See, e.g.,* Tr. 8/28/2013, 18:9–11. The medical evidence, ADA Albertson argued, proved that there was no head injury and that Koster "did not fall down and hit her head."  *Id*. at 11:11–13.   She also submitted that the toxicology analysis included in Dr. Kanfer's autopsy records proved that Koster's death was unrelated to drug or alcohol use, disproving Ganthier's claim to detectives that she "started to gag and foam" at the mouth while in his car and suffered a fall shortly after she got to his house.  *Id*. at 11:14–13:6.   She further argued that if Koster was moving while struggling with Ganthier during the stabbing, her organs could have moved, explaining why organs along the path from

the entry point of the alleged stab wound to the injured liver were unscathed. *Id.* at 23:16–24:13.

The prosecutor also urged the jury to focus on what Dr. Carver had testified was a "C-sign" in the x-ray taken by Dr. Kanfer (but which was not discussed in Dr. Kanfer's report), which the People claimed was the result of air in Koster's heart from a sharp force injury to a neck vein, causing her death. Tr. 8/28/2013, 40:8–22. She then told the jury, "And that X-ray that's in [evidence], you can see it, *if you have any medical background at all, I think one of you was a nurse,* that C he's talking about, that slight little bit, that's very easy to miss on autopsy, and I bet Kanfer did miss it." *Id.* at 40:13–17 (emphasis supplied).

Defense counsel did not object to the prosecutor's appeal to a juror's "medical background." Tr. 8/28/2013, 40:14–15. Nor did he request the court give an admonition or specific curative instruction. However, the trial court later provided a general instruction reminding jurors not to draw upon any "special expertise" in their deliberations that an "average person" might not have. Tr. 8/28/2013, 1485:21–1486:19.

On August 29, 2013, the jury returned a verdict of guilty on the sole charge of second-degree murder. Tr. 8/29/2013, 1553:18–1556:8. Judgment was entered on September 30, 2013. *Ganthier*, 149 N.Y.S.3d at 227. The trial court sentenced Ganthier to an indeterminate sentence of 25 years to life in prison. Tr. 9/30/2013, 20:25–21:5, ECF No. 7-45.

**VI. CPL 440.10 Motion**

While Ganthier's direct appeal was pending, on February 16, 2018, Ganthier moved to vacate his conviction pursuant to Section 440.10 of New York's Criminal Procedure Law ("CPL"). Pet'r CPL 440.10 Mot. ("Pet'r Mot.") 1, ECF No. 3-9. In the motion, Ganthier argued that defense counsel had violated his right to effective assistance of counsel under the Sixth Amendment and the New York State constitution by unreasonably failing to call a qualified, available expert on the issue of cause of death. Affirmation of Jonathan I. Edelstein, Pet'r Mot. ("Edelstein Aff.") ¶ 53, ECF No. 3-9. That expert, Dr. Charles V. Wetli, was the former Chief Medical Examiner of Suffolk County, New York — *i.e.,* the county in which Ganthier was charged and tried for Koster's murder — and had been retained by the defense prior to trial. *Id*. ¶¶ 39–40. In his 440 motion, Ganthier (now represented by new counsel), submitted that Dr. Wetli "was prepared to rebut the autopsy report and . . . provide[] the jury with an alternative and more scientifically valid conclusion concerning the cause of death," but that trial counsel "inexplicably chose not to call Dr. Wetli to the stand," even though Dr. Wetli's testimony would have "conclusively refute[d] the prosecution's theory of how Ms. Koster died." *Id*. ¶ 4; *see also id.* ¶ 53 (arguing cumulative impact of failure to call Dr. Wetli with other purported errors by trial counsel).

With the motion, Ganthier attached an affirmation by Dr. Wetli. Affirmation of Dr. Charles V. Wetli ("Wetli Aff."), ECF No. 3-9. Dr. Wetli had more than 30 years of experience as a medical examiner and forensic pathologist, including 11 years as

the Chief at OCME in Suffolk County. *Id.* ¶ 1. He affirmed that "prior to trial, Mr. Ganthier's attorney consulted with me and shared with me the autopsy report and other relevant medical records." *Id.* ¶ 2. "After reviewing Mr. Ganthier's case prior to trial," Dr. Wetli "offered to testify on his behalf but was never called as a witness." *Id.* ¶ 3. Dr. Wetli stated that, "[h]ad [he] been present during Dr. Carver's testimony, [he] could have advised Mr. Ganthier's counsel on how to cross-examine him more effectively" and "could have rebutted Dr. Carver's testimony in a number of respects." *Id.* ¶ 3.

Specifically, Dr. Wetli attested that he "could have rebutted Dr. Carver's opinion that sharp force injuries to the victim's neck were the cause of death." Wetli Aff. ¶ 4. He would have testified, *inter alia,* that "[t]he post-mortem chest X-ray was of poor quality and, contra Dr. Carver, no conclusion can be made about whether air was in the victim's heart," *id.* ¶ 5; that "[t]he liver injury is not a sharp force injury (i.e., stab wound) as Dr. Carver testified" and instead "is a blunt force injury," *id.* ¶ 6; that "the photographic documentation of the injuries in this case, particularly those of the neck and abdomen, is dismal and cannot support the conclusion regarding cause of death," *id.* ¶ 7; that "the absence of a wound track from the abdomen to the liver *rules out* a stab wound to the liver," *id.* ¶ 8 (emphasis in original); that the blood loss suffered by Koster "is not sufficient to cause death," *id.* ¶ 9; and, that "[t]he toxicology testing conducted on the victim was inadequate." *Id.* ¶ 11.

In its response, Respondent cited the "spirited cross-examination" of Dr. Carver by Ganthier's trial counsel, and the "countervailing facts" he elicited that

"tended to disprove a stabbing death" even without Dr. Wetli's testimony.[6]  Resp't CPL 440 Mem. ("Resp't Mem.") 2, ECF No. 3-12.  Respondent further argued that whether to call Dr. Wetli "was complicated by the prosecutor's prior relationship with that witness" which "intimated knowledge of [Wetli's] strengths and weaknesses on both direct and cross-examinations."  *Id.*  Although Respondent did not point to any specific information that ADA Albertson might have used to undermine Dr. Wetli's credibility, nor any "weaknesses" known to her that she would have exploited on cross, its response  hypothesized that their prior professional relationship could have affected Wetli's "willingness to steadfastly adhere to his opinions" had he testified. *Id.*

Respondent also submitted an affirmation from Ganthier's trial counsel William Keahon, stating that he had made a strategic decision not to call Dr. Wetli to testify.  Affirmation of William J. Keahon ("Keahon Aff."), Resp't Mem., ECF No. 3-10.  Keahon affirmed that he "used the information provided by Dr. Wetli to cross-examine Dr. Wayne Carver" and that he "believed that Dr. Carver's performance during cross-examination totally lacked credibility."  *Id.* ¶ 7.  Keahon further stated that he "did not call Dr. Wetli to testify for the defense because he would have been

---

[6] Ganthier brought this case against the Superintendent of Green Haven Correctional Facility, where Ganthier is incarcerated, as the "authorized person having custody of petitioner."  28 U.S.C. § 2254 Pet., ECF No. 1 at 1.  While the Superintendent of Green Haven Correctional Facility is the respondent as a technical matter, because the District Attorney of Suffolk County represents the Superintendent, prosecuted Ganthier, and later defended his conviction and sentence in state post-conviction proceedings, the Court shall refer to the Suffolk County District Attorney's Office as "Respondent" in this opinion.

subjected to an equally thorough cross-examination" by the prosecutor, who "had called Dr. Wetli to testify for the People when he was the Suffolk County Medical Examiner and was aware of his strengths and weaknesses as a witness." *Id.* ¶ 8. Keahon concluded that he "believed that [his] cross-examination [of Dr. Carver] would be presented better than calling Dr. Wetli as a witness" and that "[g]iven how poorly Dr. Carver testified on cross-examination, [he] believe[d] [he] made a reasonable tactical decision." *Id.* ¶ 9.

The state trial court denied Ganthier's CPL 440 motion on May 31, 2018. *People v. Ganthier*, No. 443-2010 (N.Y. Sup. Ct., Suffolk Cnty.), ECF No. 3-12 at 4. Ganthier sought leave to appeal, but the Appellate Division denied leave on September 13, 2018. *People v. Ganthier*, No. 2018-07953 (N.Y. App. Div. 2018), ECF No. 3-15 at 1.

## VII. Appellate Division Ruling on Confrontation Clause Claim

The Appellate Division denied Ganthier's direct appeal on June 2, 2021. Its opinion considered, but rejected, Respondent's claim that Ganthier had waived his objection to Dr. Carver's testimony and the admission of Dr. Kanfer's autopsy report at trial, finding that "[c]ontrary to the People's argument, the defendant's contention that his right of confrontation was violated is sufficiently preserved for appellate review inasmuch as the issue was 'expressly decided' by the trial court in response to the defendant's application." *Ganthier*, 149 N.Y.S.3d at 228 (citations omitted). The court went on to find, however, that Ganthier's contention that the trial court's admission of the autopsy findings and report in Dr. Kanfer's absence violated the

Sixth Amendment's Confrontation Clause was "without merit." *Id*. On the merits, the Appellate Division distinguished between what it characterized as the "non-opinion" and "opinion" findings in the report. *Id*. As to the former, the court found that "[t]he non-opinion portion of the autopsy report was non-testimonial in nature," citing a series of New York state court decisions including *People v. Freycinet,* 892 N.E.2d 843 (N.Y. 2008), and *People v. John*, 52 N.E.3d 1114 (N.Y. 2016). *Id*. As for the report's "opinion" portion, the Court noted that Dr. Kanfer's "unredacted opinion was admitted at the express request of the defendant's counsel." *Id*. The New York Court of Appeals denied Ganthier leave to appeal the Appellate Division's decision on October 25, 2021. *People v. Ganthier*, 176 N.E.3d 668 (Table) (N.Y. 2021).

## VIII. Instant Petition

On January 20, 2023, Ganthier, through counsel, filed the instant petition under 28 U.S.C. § 2254, asserting claims for relief under the Sixth Amendment's Confrontation Clause and its guarantee of the right to effective assistance of counsel. On April 26, 2023, Respondent filed the state court record with this Court, along with a memorandum of law in opposition to the petition. Ganthier filed a reply brief on July 13, 2023. On July 26, 2023, in the wake of the Supreme Court's decision in *Smith v. Arizona,* 602 U.S. 779 (2024), the Court gave the parties leave to file supplemental briefing regarding the significance, if any, of that decision to Ganthier's Confrontation Clause claim. On August 15 and August 16, 2024, Ganthier and Respondent filed supplemental briefing on that issue.

On January 14, 2025, this Court held oral argument on the petition with counsel for both parties.  On January 16, 2025, Respondent supplemented the record by filing certain photos and x-rays from the autopsy under seal.  This opinion follows.

## LEGAL STANDARD

The Antiterrorism and Effective Death Penalty Act ("AEDPA") "imposes a 'highly deferential standard for evaluating state-court rulings.'"  *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997)).  To grant habeas relief, the federal court must find that the state courts' adjudication of the habeas claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).[7]  The Supreme Court has stated that "clearly established federal law" for purposes of the statute "refers to the holdings, as opposed to the *dicta*, of this Court's decisions as of the time of the relevant state-court decision."  *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

For claims adjudicated on the merits, "a federal habeas court may not grant relief simply because it concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Williams*, 529 U.S. at 365.  The

---

[7] Alternatively, the federal court must find that the state courts' adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  Here, however, Petitioner does not argue that he is entitled to relief on that ground.

requirements set forth by AEDPA are strictly construed and, by design, erect a substantial barrier to federal habeas relief. These rules are founded upon the principle that "[s]tate courts are adequate forums for the vindication of federal rights" and are "presumptively competent[ ] to adjudicate claims arising under the laws of the United States." *Burt v. Titlow*, 571 U.S. 12, 19 (2013) (internal quotation marks and citation omitted).

If the Court finds that the state court unreasonably applied clearly established federal law, it then queries whether that error was harmless. "[B]ecause of the deference we afford to state courts, we find an error harmless unless it had substantial and injurious effect or influence in determining the jury's verdict." *Alvarez v. Ercole*, 763 F.3d 223, 232–33 (2d Cir. 2014) (internal quotation marks omitted); *see Brecht v. Abrahamson*, 507 U.S. 619, 623, 637–38 (1993).[8] If the error was not harmless, the Court must award the petitioner habeas relief.

## **DISCUSSION**

Ganthier argues that the state courts' rejection of his Confrontation Clause claim regarding (1) the admission of the autopsy report without the testimony of its

---

[8] As discussed in the section of this opinion on harmless error (Discussion III.), whether the error had "substantial and injurious effect or influence in determining the jury's verdict" is the test applied where, as here, the state appellate court did not issue a holding on whether the alleged error it evaluated was harmless. *Cf. Brown v. Davenport*, 596 U.S. 118, 127, 136 (2022) (holding that where the state court did issue a ruling on harmlessness, the federal habeas court must consider both whether the error had a substantial and injurious effect or influence in determining the jury's verdict and whether every fairminded jurist would agree that the error was prejudicial).

author, Dr. Kanfer, and (2) the surrogate testimony of Dr. Carver, who did not conduct the autopsy yet testified in considerable detail about Dr. Kanfer's methods and findings, was an unreasonable application of clearly established federal law, namely, *Crawford v. Washington*, 541 U.S. 36 (2004), and its progeny.  Pet'r Mem. at 26–36.  In particular, Ganthier argues that the state court's denial of his claim cannot be reconciled with the Supreme Court's decisions in *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), and *Bullcoming v. New Mexico*, 564 U.S. 647 (2011), each of which were decided prior to Ganthier's 2013 murder trial.  Pet'r Mem. at 26–36. Ganthier submits that the trial court and the Appellate Division improperly applied New York's "business records" exception to the hearsay rule rather than Supreme Court precedent, which, he argues, makes clear that the Confrontation Clause bars the admission of forensic reports that contain precisely the kinds of scientific observations and findings found in Dr. Kanfer's autopsy report — as well as "surrogate testimony" about those findings — unless the report's author is produced for cross-examination.  *Id.*

Ganthier also argues that the state courts unreasonably denied his ineffective assistance of counsel claims.  He focuses, in particular, on trial counsel Keahon's failure to call his previously-retained expert witness — former Suffolk County Chief Medical Examiner Dr. Charles Wetli — to rebut Dr. Carver's testimony and provide affirmative support for the defense's theory that Rebecca Koster suffered an accidental death due to blunt force trauma from a fall in Ganthier's home.  Pet'r Mem. at 36–48.  He argues that, even accounting for the considerable deference that

31

must be given to trial counsel's decisions and the state court's assessment of counsel's performance, Keahon's failure to call Dr. Wetli was not supported by any reasonable strategic judgment and severely prejudiced the defense case. *Id*. at 45–48. In addition, he cites the cumulative impact of three additional alleged errors by trial counsel: (1) Keahon's elicitation of damaging testimony from Dr. Carver about an out-of-court opinion by a non-testifying doctor (Dr. Gill) with whom Dr. Carver had briefly conferred about the autopsy findings; (2) Keahon's failure to object when the prosecutor in summation referred to one of the jurors being a nurse and urged that juror to apply her "medical background" to evaluate the expert testimony about the decedent's x-ray; and (3) Keahon's failure to object when the prosecutor referred to him as a "courtroom bully" in summation. *Id*. at 39–48.

For the reasons set forth below, the Court finds that Ganthier is entitled to habeas relief on his Confrontation Clause claim. In this respect, the Court's analysis is guided in significant part by the Second Circuit's grant of habeas relief in the highly analogous case of *Garlick v. Lee,* 1 F.4th 122 (2d. Cir. 2021). In *Garlick,* the Circuit found that the New York courts unreasonably denied the petitioner relief from his murder conviction after improperly relying on earlier state-court decisions that (mis)categorized autopsy reports as non-testimonial "business records" outside the scope of the Confrontation Clause. *Id*. at 133–34. As the *Garlick* court noted, these state-court precedents — some of which the New York Court of Appeals has itself recognized are no longer good law, and which the Appellate Division similarly relied upon to deny relief to Ganthier — simply cannot be reconciled with the Supreme

Court's core holdings in *Crawford, Melendez-Diaz*, and *Bullcoming*. *Id.* at 136. For largely the same reasons detailed in *Garlick*, the state courts clearly misapplied these precedents in rejecting Ganthier's Confrontation Clause claim.

Nor is there any merit to Respondent's contentions that Ganthier's trial counsel waived this claim on his behalf, and that any error was harmless. With respect to waiver, Ganthier's Confrontation Clause objection was clearly made and preserved at trial before the case was submitted to the jury, as the Appellate Division itself found before denying the claim on its merits. *Ganthier*, 149 N.Y.S.3d at 228. And at a murder trial where there was no dispute that Ganthier was alone with Rebecca Koster when she died, where the primary — and arguably only — disputed issue was the cause of her death, and where the autopsy findings were essential to the jury's resolution of that dispute, the admission of Dr. Kanfer's autopsy report and Dr. Carver's surrogate testimony about its findings and conclusions was in no way harmless.

Accordingly, since Ganthier is entitled to a new trial based on the state's violation of his rights under the Confrontation Clause, the Court need not and does not decide whether Ganthier is also entitled to relief on grounds of ineffective assistance of trial counsel, both as to his individual claims and the cumulative impact of trial counsel's alleged errors.

# I. Confrontation Clause Violation

The Court first considers whether the admission of Dr. Kanfer's autopsy report and Dr. Carver's testimony about its contents, without the production of Dr. Kanfer

as a witness, violated Ganthier's Confrontation Clause rights. Because under AEDPA the Court must assess whether the state court's rejection of Ganthier's Confrontation Clause claim was an unreasonable application of clearly established federal law at the time of the state court's adjudication of his claim, the Court begins by discussing U.S. Supreme Court precedent in effect prior to the state court proceedings.

A. Supreme Court Precedent

The Sixth Amendment to the U.S. Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The Supreme Court has held that the admission of "testimonial statements of a witness who did not appear at trial" would violate the Sixth Amendment's Confrontation Clause, "unless [that witness] was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford*, 541 U.S. at 53–54. The Confrontation Clause specifically applies to testimonial hearsay, which refers to out-of-court testimonial statements offered to establish the truth of the matter asserted. *See id.* at 59 n.9; *see also Davis v. Washington*, 547 U.S. 813, 823 (2006) (describing "testimonial hearsay" as the "primary object" of the Sixth Amendment and describing the Clause's limitation to testimonial hearsay as "so clearly reflected in the text of the constitutional provision" that it "must fairly be said to mark out not merely its 'core,' but its perimeter"). Thus, to determine whether an accused's Confrontation Clause rights are implicated, the Court must determine whether the out-of-court statements in question — Dr.

34

Kanfer's autopsy report, and Dr. Carver's testimony about its contents — are testimonial hearsay.

In *Davis*, the Supreme Court held that statements given during police interrogation are testimonial "when the circumstances objectively indicate that there is no . . . ongoing emergency, and that the *primary purpose* of the investigation is to establish or prove past events potentially relevant to later criminal prosecution." 547 U.S. at 822 (emphasis supplied). The Supreme Court returned to the "primary purpose" language in *Michigan v. Bryant*, finding that out-of-court statements for which circumstances objectively indicated that the "primary purpose of the interrogation" was "to enable police assistance to meet an ongoing emergency" were non-testimonial and that their admission therefore did not violate the Confrontation Clause. 562 U.S. 344, 349 (2011) (quoting *Davis*, 547 U.S. at 822).

Most relevant to Ganthier's claim are two cases in the *Crawford* line in which the Supreme Court considered whether forensic reports qualified as "testimonial" under the Confrontation Clause and whether, without violating the Sixth Amendment, a trial court may admit such reports into evidence even where prosecutors did not produce the analyst who authored them for cross-examination. *See Melendez-Diaz,* 557 U.S. at 307; *Bullcoming*, 564 U.S. at 652.

In *Melendez-Diaz*, which predated Ganthier's trial by four years, the Court found that a crime laboratory's "certificates of analysis" that purported to show that substances seized by law enforcement contained cocaine fell within the "core class of testimonial statements" covered by the Confrontation Clause. 557 U.S. at 310

(quoting *Crawford*, 541 U.S. at 51). The Court identified the certificates as "quite plainly affidavits" — one of the examples cited in *Crawford* — because they were "a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Melendez-Diaz*, 557 U.S. at 310; *see also id.* at 329–30 (Thomas, J. concurring). Indeed, the Court readily found that the certificates were "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Melendez-Diaz*, 557 U.S. at 311 (quoting *Crawford*, 541 U.S. at 52). Among other reasons, this was because, under Massachusetts law, "the *sole purpose* of the affidavits was to provide prima facie evidence of the composition, quality, and the net weight of the analyzed substance." *Id.* (internal quotation marks omitted). The Court also flatly rejected the State's argument that the authors of drug-analysis certificates were not "accusatory" witnesses who were not subject to confrontation because (according to the State) they did not "directly accuse petitioner of wrongdoing," since their testimony was arguably "inculpatory only when taken together with other evidence linking petitioner to the contraband." *Id.* at 313. As the Court explained, even though the analyst's testimony proved only "one fact necessary for [the defendant's] conviction — that the substance he possessed was cocaine" — the analyst was not "somehow immune from confrontation." *Id.* at 313.

Two years later, in *Bullcoming*, the Supreme Court considered whether another forensic laboratory report — one that certified, based on "machine-generated test results," that a defendant's blood-alcohol concentration was above the level

needed to convict him for aggravated driving while intoxicated — was testimonial. 564 U.S. at 647, 651. The Court found that "*Melendez-Diaz* left no room for [the] argument" that it was non-testimonial. *Id.* at 663. Though the State argued that the forensic laboratory report in *Bullcoming* fell outside the core class of testimonial hearsay because it was "unsworn," whereas the certificates in *Melendez-Diaz* were "sworn to before a notary public," the Court rejected that distinction. *Bullcoming*, 564 U.S at 664 (quoting *Melendez-Diaz*, 557 U.S. at 311). For the blood-alcohol reports in *Bullcoming*, like the certificates of analysis in *Melendez-Diaz*, were generated only after "a law-enforcement officer provided seized evidence to a state laboratory required by law to assist in police investigations." *Id.* at 664 (internal citations omitted). And in both cases, the forensic laboratory report was created after an analyst tested evidence and produced a certificate with the results in a formalized, signed document labeled as a "report." *Id.* at 664–65.

*Bullcoming* also made clear that the Confrontation Clause precludes prosecutors from offering a testimonial hearsay statement contained in a forensic report through a *different* expert witness who did not perform the underlying analysis nor author the report itself — what the Court referred to as impermissible "surrogate testimony." 564 U.S. at 652. In *Bullcoming*, instead of calling the author of the forensic laboratory analysis report on the defendant's blood alcohol concentration, the State called a different analyst "who was familiar with the laboratory's testing procedures, but had neither participated in nor observed the test on [the defendant's] blood sample." *Id.* at 651. This violated the defendant's Confrontation Clause rights.

37

*Id.* at 652. The Court held that where "the prosecution [ ] introduce[s] a forensic laboratory report containing a testimonial certification — made for the purpose of proving a particular fact — through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification," that "surrogate testimony . . . does not meet the constitutional requirement" of the Sixth Amendment. *Id.* Indeed, even though prosecutors in *Bullcoming* had argued that the author of the report "simply transcribed the resul[t] generated by . . . [a] machine" and was a "mere scrivener," the Court held that the Confrontation Clause nonetheless required the State to produce the report's author for cross-examination, either at trial or in pretrial proceedings. *Id.* at 659–60.

B. *Garlick v. Lee*: Applying Supreme Court Precedent to Grant Habeas Relief

A habeas court may only award relief under § 2254(d)(1) if it finds that a petitioner's state court proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, *as determined by the Supreme Court of the United States*." 28 U.S.C. § 2254(d)(1) (emphasis supplied). Thus, even a decision of the Second Circuit with strong factual and legal parallels to Ganthier's is not the sort of "precedent" that would strictly control this Court's analysis in virtually all other contexts. Nevertheless, Ganthier relies heavily on the Second Circuit's opinion in *Garlick,* 1 F.4th at 125, to support his Confrontation Clause claim — and with good reason. For even if *Garlick* does not directly control the outcome of the instant case, the Circuit's application of *Crawford, Melendez-Diaz* and *Bullcoming* to hold that a habeas petitioner was entitled to relief

38

based on the erroneous admission of an autopsy report at his murder trial is highly instructive here.

In *Garlick*, the Second Circuit concluded that the New York courts violated clearly established federal law by (1) allowing the admission of an autopsy report at Garlick's murder trial without requiring prosecutors to produce the analyst who conducted the autopsy and prepared the report, and (2) permitted a surrogate witness from the New York City Office of the Chief Medical Examiner to "lay[ ] a foundation" for admission of the report as a "business record" and then to testify about its contents. *Garlick*, 1 F.4th at 126–28. Writing for a unanimous panel, Judge Menashi found that the New York courts clearly violated Garlick's right to cross-examine the medical examiner who conducted the autopsy and prepared the report, as that right was clearly established by the Supreme Court's decisions in *Melendez-Diaz* and *Bullcoming*.

In addition, the *Garlick* court found that the New York courts plainly erred in relying on a test adopted in earlier state-court decisions to determine whether a forensic report is "testimonial" within the meaning of the Sixth Amendment, including, *inter alia, People v. Freycinet,* 892 N.E.2d 843 (N.Y. 2008), and *People v. John*, 52 N.E.3d 1114 (N.Y. 2016) — each of which the Appellate Division also relied upon to deny Ganthier's Confrontation Clause claim. *Ganthier,* 149 N.Y.S.3d at 228. As *Garlick* explained, the test applied by the New York courts in *Freycinet* and its progeny is an unreasonable application of federal law, because it "contradicts clearly

established Supreme Court precedent." 1 F.4th at 135–36.[9]  Specifically, the state

courts' reliance on those New York state precedents "to conclude that Garlick's right

of confrontation was not violated because the report, which [did] not link the

commission of the crime to a particular person, was not testimonial" could not be

reconciled with "clearly established Supreme Court precedent" that predated

Garlick's 2011 murder trial.  *Garlick*, 1 F.4th at 136.  Indeed, in the wake of *Garlick*,

the New York Court of Appeals has now expressly recognized that "*Freycinet*'s . . .

framework for determining the testimonial nature of evidence does not survive

*Melendez-Diaz* and *Bullcoming*."  *People v. Ortega*, 227 N.E.3d 302, 308 (N.Y. 2023)

---

[9] In *John*, the New York Court of Appeals held that a defendant's Sixth Amendment right to confrontation *was* violated when the prosecution introduced DNA reports into evidence to show that the defendant's DNA was found on a gun he was charged with unlawfully possessing, when the prosecution failed to "produce[ ] a single witness who conducted, witnessed or supervised the laboratory's generation of the DNA profile from the gun or defendant's exemplar." 52 N.E.3d at 1115. In *dicta*, however, the New York Court of Appeals stated that its holding did not mean the court was "retreating from [its] prior decisions holding that, given the primary purpose of a medical examiner in conducting autopsies, such redacted reports . . . are not testimonial." *Id.* at 1128.

In *Freycinet*, the case the Second Circuit described as the predecessor to *John*, the New York Court of Appeals held that an autopsy report redacted to eliminate the autopsy doctor's opinions was non-testimonial and could be discussed through a doctor who did not author the report, because the report "was very largely a contemporaneous, objective account of observable facts" and "did not directly link defendant to the crime" but instead was "concerned only with what happened to the victim, not with who killed her." 892 N.E.2d at 843.

But these decisions conflicted with clearly established federal law. For as the *Garlick* Court explained, the Supreme Court has unequivocally held that "forensic reports that 'do not directly accuse [the defendant] of wrongdoing'" or that are "observations of an 'independent scientist' made 'according to a non-adversarial public duty'" are not inherently non-testimonial. 1 F.4th at 136 (first quoting *Melendez-Diaz*, 557 U.S. at 313–14 (alteration in original); and then quoting *Bullcoming*, 564 U.S. at 665).

(holding that autopsy reports at issue were testimonial and that introduction of autopsy reports through surrogate testimony of doctor who did not perform the autopsy violated Confrontation Clause).

Applying those precedents, the *Garlick* court found that the contents of the absent analyst's autopsy report were unquestionably "testimonial." 1 F.4th at 133–34. It did so for several reasons. First, "[a]s in *Melendez-Diaz* and *Bullcoming*, law enforcement provided seized evidence — the victim's body — to a state laboratory required by law to assist in police investigations." *Id.* at 134. The preparations for this autopsy occurred at a detective's request, with preliminary documents reflecting OCME's conversation with that detective; the autopsy itself was performed with two detectives present; and, after completing the autopsy, the physician "promptly" notified law enforcement of her autopsy findings, who then dropped charges against one suspect and initiated a murder charge against Garlick. *Id.* The final report was then delivered to the district attorney's office in the Bronx. *Id.* The Court thus found that "any objective witness . . . would have expected that the statements contained in the report would be used in a later prosecution." *Id.*

Second, in *Garlick,* "[j]ust as in *Melendez-Diaz* and *Bullcoming*, the medical examiner 'prepared a certificate concerning the result' of the examination that was 'formalized' in a signed document." 1 F.4th at 134. The autopsy report had "[f]urther indications of the report's solemnity," including its formal title, its affixation with the OCME seal, a certification by the physician that she performed the autopsy at the date and time indicated, and initials and "draft" and "final" dates on the autopsy

41

report. *Id.* Finally, the autopsy report was "used extensively at trial for the purpose of proving key facts — including, notably, that it was Garlick, rather than [an alternate suspect] who caused the victim's death." *Id.*[10]

### C. Application to Ganthier's Case

Under Supreme Court precedent that existed at the time of the state court adjudication, the state court's finding that Dr. Carver's surrogate testimony and the admission of Dr. Kanfer's full autopsy report did not violate the Confrontation Clause was an erroneous and unreasonable application of federal law.

Both *Melendez-Diaz* (2009) and *Bullcoming* (2011) were decided well before Ganthier's 2013 trial. Those decisions made clear that Ganthier's Confrontation Clause rights were violated by the introduction of Dr. Kanfer's autopsy report —

---

[10] The Second Circuit in *Garlick* further noted that *John*'s apparent reliance on a Second Circuit case — *United States v. James*, 712 F.3d 79, 95 (2d Cir. 2013) — as support for the view that redacted autopsy reports are non-testimonial was misplaced. *Garlick*, 1 F.4th at 135 n.7. In *James*, the Second Circuit held that the autopsy report at issue in that case was not testimonial, and therefore did not trigger Confrontation Clause concerns when its author did not testify, where it was not argued that the autopsy was "anything other than routine," where there was "no suggestion" that anyone involved in the autopsy suspected the decedent had been murdered or that the autopsy "would be used at a criminal trial," where the autopsy was completed "substantially before any criminal investigation into [the decedent's] death had begun," and where there was no testimony elicited that law enforcement was ever notified that the decedent's death was suspicious or that "any medical examiner expected a criminal investigation to result from it." 712 F.3d at 98–99. The Second Circuit in *Garlick* noted that "*James* did not hold that autopsy reports do not 'link the commission of the crime to a particular person'" and that "[n]or did *James* hold that such linkage determines whether a statement is testimonial." *Garlick*, 1 F.4th at 135 n.7 (quoting *John*, 52 N.E.3d at 1128). The Second Circuit noted that instead, "*James* cautioned that *Melendez-Diaz* and *Bullcoming* 'cast doubt on any categorical designation of certain forensic reports as admissible in all cases.'" *Id.* (quoting *James*, 712 F.3d at 88).

including what the Appellate Division characterized as the "non-opinion" portions of that report — without the production of Dr. Kanfer for cross-examination.  And the Second Circuit's application of the Supreme Court's precedents in *Garlick* applies squarely to Ganthier's case, providing clear guidance to this Court on how to evaluate the merits of his Confrontation Clause claim.  Applying *Melendez-Diaz* and *Bullcoming,* the state courts clearly erred in holding that Dr. Kanfer's report was non-testimonial and could be independently admitted as a "business record."

### 1.  Indicia of Formality

Dr. Kanfer's autopsy report was plainly among the "formalized testimonial materials" that "'fall within the core class of testimonial statements' governed by the Confrontation Clause."  *Melendez-Diaz*, 557 U.S. at 329–30 (Thomas, J. concurring) (quoting *White v. Illinois*, 502 U.S. 346, 365 (1992)).  The autopsy report was a signed document, Autopsy Report at 5; created on OCME letterhead with what appears to be the OCME or State of Connecticut insignia from that time, *id.* at 1; included a certification by Dr. Kanfer that he performed the autopsy on Koster at the date and time written, *id.*; and included a signature by Dr. Kanfer following his final finding on the cause of death and manner of death under the text, "This is a true statement of the postmortem findings upon the body of Rebecca Eladia Koster."  *Id.* at 5.  Those characteristics mirror the "indications of . . . solemnity" that the Second Circuit identified in the autopsy report in *Garlick*.  1 F.4th at 134.

Moreover, in *Melendez-Diaz*, the Supreme Court made clear that even if certain records "qualify as traditional official or business records" that may

"ordinarily be admitted at trial despite their hearsay status," if those records are made in "the production of evidence for use at trial," they still implicate an accused's Confrontation Clause rights. 557 U.S. at 321 (internal citations omitted). Thus, even at the time the trial court considered Dr. Kanfer's autopsy report, the question was not whether the autopsy report would fit within an exception for the prohibition against hearsay, as the prosecution argued at trial, but rather whether the report was testimonial and therefore impacted Ganthier's Confrontation Clause rights under the Sixth Amendment. Similarly, in *Bullcoming*, the Court held that a blood-alcohol analysis report was testimonial where "a law-enforcement officer provided seized evidence to a state laboratory required by law to assist in police investigations," an analyst "tested the evidence and prepared a certificate concerning the results of [the] analysis," and the certificate was "'formalized' in a signed document." 564 U.S. at 665 (quoting *Davis*, 547 U.S. at 837, n.2). Here, too, Dr. Kanfer's report was formalized in a document on official letterhead and included a certification and signature by Dr. Kanfer. Autopsy Report at 1, 5. Even if the autopsy report may in other contexts qualify as a "business record," under the Confrontation Clause, the key inquiry is whether it was created in connection with "the production of evidence for use at trial," which, as discussed below, it clearly was. *Melendez-Diaz*, 557 U.S. at 321.

### 2. Circumstances Surrounding the Preparation of the Report

Alongside its indicia of formality, the autopsy report had a "primary purpose" of proving facts used to advance the prosecution's case at trial, *see Bryant*, 562 U.S.

at 358, and was created "under circumstances which would lead an objective witness reasonably to believe that the statement[s] would be available for use at a later trial," making it a testimonial statement for purposes of the Confrontation Clause. *Melendez-Diaz*, 557 U.S. at 311.

This is so for several reasons. First, the final autopsy report clearly informed law enforcement's charging decisions in Ganthier's case. In *Garlick*, law enforcement did not pursue charges against one suspect and initiated them against another after receiving the final autopsy report. 1 F.4th at 134. In Ganthier's case, Detective Philip Frendo testified that the original murder charge brought against Ganthier was "withdrawn" — even after Ganthier admitted, in his first voluntary interview with police, that Rebecca Koster had died in his presence and that he had covered up her death — while law enforcement waited for the Connecticut OCME to complete the autopsy and issue a final report. Tr. 8/20/2013, 50:24–51:18. Only after the report was finalized and Dr. Kanfer opined (1) that the cause of death was "stab wound of abdomen" and (2) that the manner of death was "homicide" did law enforcement re-initiate murder charges against Ganthier. Autopsy Report at 5; Tr. 8/20/2013, 58:23–59:6, 60:16–23, 69:14–21.

Second, just as in *Garlick*, "[a]s intended, the autopsy report was used extensively at trial for the purpose of proving key facts." 1 F.4th at 134 (first citing *Crawford*, 541 U.S. at 40–41; then citing *Bullcoming*, 565 U.S. at 655–66). The *Garlick* Court noted that the prosecution "used the autopsy report in its opening and closing statements" and used its "conclusions on the manner and cause of death to

eliminate [one suspect] as a potential cause of the victim's death and to prove Garlick's intent to cause serious physical injury." 1 F.4th at 134. Similarly, at Ganthier's trial, the prosecution relied heavily on the autopsy report, and Dr. Carver's testimony based on the scientific findings and clinical observations detailed in the report, in opening arguments, *see* Tr. 7/24/2013, 59:2–7, 59:21–60:18, 61:8–12, 62:23–63:7, 76:21–77:21, 82:13–83:4, 83:8–15, 84:17–20, as well as throughout its summation. *See* Tr. 8/28/2013, 11:7–20, 12:1–16:11, 17:24–30:24, 31:7–32:1, 32:13–19, 37:1–3, 40:6–41:2. Critically, Ganthier did not deny that he was the last person to see Koster alive, nor that he had used a knife to cut away portions of Koster's corpse and attempted to set it on fire in what Ganthier claimed was a panicked effort to avoid a wrongful murder charge. Instead, his defense at trial turned on his claim that she died from blunt force trauma, and specifically (as he maintained in his earlier interviews with police) that she died after gagging and foaming at the mouth and then tripping and falling in his garage. *See* Tr. 8/27/2013, 1309:18–19 (defense summation) ("There's one issue in this case. It's cause of death"). For this reason, Dr. Kanfer's autopsy report, and Dr. Carver's testimony detailing the autopsy's findings, were the literal cornerstone of the prosecution's claim that Koster died because of stab wounds inflicted by Ganthier while she was still alive, and not from an overdose or accidental head injury.

Finally, as in *Garlick*, "[t]he autopsy was performed in the presence of . . . detectives." 1 F.4th at 134. During Koster's autopsy, detectives investigating her death were present while the autopsy occurred, took photographs, and obtained

46

evidence from her corpse. Tr. 7/26/2013, 24:11–28:18. These facts further underscore why any objective witness would "believe that the [autopsy report] would be available for use at a later trial." *Crawford*, 541 U.S. at 52 (citation omitted).

To be sure, there are some differences between the facts in *Garlick* and those in *Ganthier*. But none are material under the Confrontation Clause. For example, in *Garlick*, the Second Circuit noted that "law enforcement provided [the] seized evidence — the victim's body — to a state laboratory required by law to assist in police investigations." *Garlick*, 1 F.4th at 134. Here, the Court is not aware of evidence in the state record that law enforcement provided Koster's body to the Connecticut OCME or directed OCME to retrieve the body. Instead, though a crime unit "t[ook] overall responsibility . . . for this particular investigation," Tr. 7/25/2013, 140:2–11, staff from OCME arrived and removed the decedent's body themselves. *Id.* at 162:13–163:9. Additionally, in *Garlick*, "[p]reparations for the autopsy commenced at [a detective's] request," 1 F.4th at 134, and there is no such evidence here.

Those minor factual distinctions do not change the fact that here, just as in *Garlick*, Koster's "autopsy was performed in aid of an active police investigation," 1 F.4th at 134, and the circumstances in total "would lead any objective witness to 'believe that the [report] would be available for use at a later trial.'" *Id.* (quoting *Crawford*, 541 U.S. at 52). When a trooper arrived on the scene after a man called 911 and reported a body on fire (later confirmed to be Koster's), he subsequently told the fire chief to extinguish the fire but cautioned him that it was a "crime scene." Tr. 7/25/2013, 125:12–16, 130:3–131:2. The Connecticut Eastern District Major Crime

47

Unit then "t[ook] overall responsibility" for the investigation. *Id.* at 140:2–11. That night, staff from OCME arrived and removed the decedent's body at 12:15 a.m. *Id.* at 162:13–163:9. The autopsy occurred that day, with detectives present. Tr. 7/26/2013, 24:4–24. One of the detectives testified at trial that his "function at the morgue that day" was "to collect evidence." *Id.* at 24:22–24. As the trooper who arrived at the scene himself testified, "it was obvious it was a death that needed to be investigated, something that major crime would typically investigate." Tr. 7/25/2013, 141:4–7.[11]

### 3. "Opinion" Testimony

Respondent argues that Dr. Carver did not provide "a mere recitation of conclusions drawn by Dr. Kanfer" but rather "provide[d] his independent opinion" on the cause of Koster's death, and so, even if the autopsy report were testimonial, it was not error for the state court to allow the report into evidence. Resp't Mem. at 16–

---

[11] Respondent also argues that the autopsy report was not testimonial because the autopsy was performed pursuant to the office's medical examiner's independent duty to investigate certain deaths, and not for proving facts at trial. Mem. of Law in Opp'n to Pet. ("Resp't Mem.") 14–15, ECF No. 8-1. But the U.S. Supreme Court squarely rejected that argument in the context of blood-alcohol analysis reports — specifically the argument that such reports "were simply observations of an 'independent scientis[t]' made 'according to a non-adversarial public duty,'" — in *Bullcoming.* 564 U.S. at 664 (quoting *Bullcoming* respondent's brief). Indeed, as the Second Circuit confirmed in *Garlick,* "[t]hus, even 'observations of an independent scientist made according to a non-adversarial public duty' are testimonial if made in aid of a police investigation or if it were reasonably known that the observations would be available for use at a later trial." 1 F.4th at 132 (quoting *Bullcoming,* 564 U.S. at 664 (internal quotation marks and alterations omitted in original)).

48

17. But that argument is foreclosed by U.S. Supreme Court precedent that predates Ganthier's trial.[12]

In *Bullcoming*, the Supreme Court made clear that the "surrogate testimony" of a witness who provides his or her own assessment of the statements contained in a forensic report authored by another, absent analyst violates the Confrontation Clause. 564 U.S. at 652. Indeed, *Bullcoming* involved a report whose underlying method of forensic analysis was far less subjective and nuanced than the autopsy at issue here — it concerned a blood-alcohol analysis report, which was created using "gas chromatograph machines to determine [blood alcohol concentration] levels." *Id.* at 654. Nevertheless, the Supreme Court relied on the facts that the machines

---

[12] On this point, Respondent chiefly relies on the Second Circuit's decision in *United States v. James*, 712 F.3d at 79, in which the Court found that it was not error for a trial court to have allowed an OCME deputy chief medical examiner to testify on a report of an autopsy that she had not done herself. *Id.* at 97, 99. As a preliminary matter, *James* was decided before *Garlick*, which is the more recent Second Circuit decision on the question of whether an autopsy report can be introduced through the surrogate testimony of a physician who did not author the report. More fundamentally, the actual holding in *James* was not that a non-author witness can testify about an autopsy report they did not author because the report merely forms the basis for their independent opinions. Instead, *James* held that the autopsy report in that case was not testimonial and therefore did not implicate the Confrontation Clause as a threshold matter. *Id.* at 97–99. The *James* Court relied on the facts that neither defendant in the case argued that the autopsy in question was anything other than routine; that "there is no suggestion that . . . anyone else involved in this autopsy process suspected that [the decedent] had been murdered and that the medical examiner's report would be used at a criminal trial"; and, that the autopsy report was completed some six months before any criminal investigation into the decedent's death occurred. *Id.* Not only do those facts quickly distinguish *James* from the circumstances surrounding Dr. Kanfer's autopsy report, but they also underscore that the Second Circuit did not find in *James* that it never violates the Confrontation Clause when an expert who did not complete an autopsy testifies to their opinions stemming from their review of the report.

utilized by the analyst "require[ ] specialized knowledge and training," and involve "several steps," during which "human error can occur." *Id.* The Court flatly rejected the State's argument that — because the author-analyst "simply transcribed the resul[t] generated by . . . [a] machine" and was a "mere scrivener" — the non-author's surrogate testimony satisfied the Confrontation Clause rights of the accused. *Id.* at 659–60.

If running blood-alcohol concentration tests through gas chromatograph machines "requires specialized knowledge and training," and "several steps" in which "human error can occur," undoubtedly so, too, does the far more involved and complex process of conducting an autopsy of a human corpse. *Bullcoming*, 564 U.S. at 654. Critically, the *Bullcoming* Court emphasized that surrogate testimony could not elucidate what the author-analyst "knew or observed about the events his certification concerned, *i.e.*, the particular test and testing process he employed," nor could the surrogate testimony "expose any lapses or lies on the certifying analyst's part." *Id.* at 661–62. Thus, even where Dr. Carver's opinions were different than Dr. Kanfer's, those opinions relied on "the events [Dr. Kanfer's] certification concerned," and the Confrontation Clause demands Ganthier be provided an opportunity, through cross-examination, to "expose any lapses or lies on [Dr. Kanfer's] part." *See id.*

For all of these reasons, the state court's holding that admission of Dr. Kanfer's autopsy report in Dr. Kanfer's absence and through the surrogate testimony of Dr. Carver did not violate Ganthier's Confrontation Clause rights was an "unreasonable

application of[ ] clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

## II. Waiver of Confrontation Clause Claim

Having found that the State violated the Confrontation Clause at Ganthier's trial, the Court now turns to Respondent's argument that, through his trial counsel, Ganthier "waived any confrontation claim." Resp't Mem. 10–12; *see also* Suppl. Mem. of Law in Opp'n to Pet. ("Resp't Suppl. Mem.") 3–5, ECF No. 12. It is well established that "defense counsel may waive a defendant's Sixth Amendment right to confrontation where the decision is one of trial tactics or strategy that might be considered sound." *United States v. Plitman*, 194 F.3d 59, 64 (2d Cir. 1999). Here, however, the Court finds that no such waiver occurred.

The state-court record that forms the basis of Respondent's waiver argument is far from clear given that critical portions of the trial court's consideration of this issue were not recorded. However, the Court finds that the most reasonable inference from those portions of the trial record that are available appears to be the following: Ganthier's trial counsel initially did object to the admission of the report and to Dr. Carver's testimony but was ultimately persuaded, in an off-the-record chambers discussion, by the prosecutor's claim that under New York law, the defense "had no legal basis to make an objection to prevent that autopsy report from going in[.]" Tr. 8/23/2013, 1241:14–21.[13] Yet, as noted *supra,* defense counsel's initial concession

---

[13] As noted earlier, the initial chambers colloquy between counsel and the trial judge on this critical issue was not recorded or transcribed. Yet ADA Albertson

appears to have resulted from an incomplete or erroneous understanding of "the case law" by the prosecutor and trial court in this chambers colloquy — specifically, one that was based on now-invalidated precedent by the New York Court of Appeals that was in direct conflict with the Supreme Court's decisions in *Melendez-Diaz* and *Bullcoming*. And it was only *after* Dr. Carver testified in detail about Dr. Kanfer's autopsy that defense counsel asked for the full report to come into evidence, so that he could cross-examine Dr. Carver about certain discrepancies between his testimony and the report itself. Tr. 8/23/2013, 1241:14–21. Finally, at his client's own request, and before the case went to the jury, defense counsel did lodge a formal and complete objection, under the Confrontation Clause, to Dr. Carver's testimony and the autopsy report's admission. *Id.* at 1238:10–16. Notably, the trial court made no finding that the objection was waived by defense counsel's earlier concessions or positions. Instead, the court simply denied Ganthier's Confrontation Clause objection on the merits. Tr. 8/26/2013, 1245:22–1246:20.

This Court has no difficulty finding that Ganthier's trial counsel did not waive his client's Confrontation Clause claim. Most critically, the New York Appellate

---

subsequently noted, on the record, that defense counsel had made clear in that earlier discussion that the defense "did not want the autopsy report to go into evidence" before being persuaded to change course. Tr. 8/23/2013, 1240:21–1241:2. Combined with the renewed and complete objection to the report's admission that counsel made at his client's request prior to the close of trial, this was clearly sufficient to preserve Ganthier's claim. *See, e.g., Anderson v. Branen,* 17 F.3d 552, 556–57 (2d Cir. 1994) (finding that even where counsel "fail[s] to object on [the]record" to a jury instruction at trial, the claim of error is not waived "where the party's position has previously been made clear to the trial court and it was apparent that further efforts to object would be unavailing").

Division on Ganthier's direct appeal of his conviction held that Ganthier's objection to the admission of the autopsy report *was* preserved at trial. *Ganthier*, 149 N.Y.S.3d at 228 ("Contrary to the People's argument, the defendant's contention that his right of confrontation was violated is sufficiently preserved for appellate review inasmuch as the issue was 'expressly decided' by the trial court in response to the defendant's application." (quoting N.Y. Crim. Proc. Law § 470.05[2])). This Court cannot and will not disturb the state court's determination that Ganthier cleared the procedural bar necessary for a merits ruling on his Confrontation Clause claim. For it is well settled that "procedural default for failure to comply with a state procedural requirement bars habeas review only when the state court rendering the judgment clearly and expressly states that its judgment rests on a state procedural bar." *Galdamez v. Keane*, 394 F.3d 68, 77 (2d Cir. 2005); *see also DeBerry v. Portuondo*, 403 F.3d 57, 66 (2d Cir. 2005) ("[A] waiver on which the state court did not explicitly rely will not bar our review of the merits of a claim.").

After finding Ganthier's Confrontation Clause claim sufficiently preserved and not waived, the Appellate Division proceeded to consider and then deny the claim on the merits. *See Ganthier*, 149 N.Y.S.3d at 228 (finding that "the defendant's contention [that his Confrontation Clause rights were violated] is without merit.") As its merits holding, the Court explained that "[t]he non-opinion portion of the

autopsy report was non-testimonial in nature" and that "the unredacted opinion was admitted at the express request of the defendant's counsel." *Id.*[14]

Respondent argues that the Appellate Division's statement that "the unredacted opinion was admitted at the express request of the defendant's counsel" should be interpreted as at least a partial waiver — that is, that Ganthier waived any Confrontation Clause violation arising from the admission of the so-called "opinion" portions of the report, *i.e.,* its ultimate findings as to Koster's "cause of death." But Respondent's interpretation ignores the fact that the quoted language was part of the Appellate Division's *merits* analysis of Ganthier's Confrontation Clause claim, which the Appellate Division had already — and explicitly — found was preserved. *Ganthier*, 149 N.Y.S.3d at 228. And to the extent Respondent otherwise argues that Ganthier waived his objection to the so-called "opinion" portions of the report (or the Appellate Division's decision may be read to so find), Ganthier is still entitled to habeas relief under the Confrontation Clause, for two reasons.

First, Respondent's distinction between "opinion" and "non-opinion" portions of the report is one that simply does not exist under clearly established Supreme

---

[14] The Appellate Division here cited *People v. Freycinet*, 892 N.E.2d 843 (N.Y. 2008)). *Freycinet* involved an autopsy report that was "redacted to eliminate [the doctor's] opinions as to the cause and manner of the victim's death" and "was received in evidence over defendant's Confrontation Clause objection." 892 N.E.2d at 843. The New York Court of Appeals identified "[t]he only issue on this appeal" as "whether the redacted version of [the] autopsy report was 'testimony' as that term is used in *Crawford*." *Id.* The New York Court of Appeals held that the report was non-testimonial. *Id.* As noted previously, the New York Court of Appeals has effectively overruled *Freycinet,* recognizing that *Freycinet*'s framework for assessing whether evidence was testimonial cannot be reconciled with *Melendez-Diaz* and *Bullcoming*. *Ortega*, 227 N.E.3d at 308, 311.

Court precedent.  In *Bullcoming*, the U.S. Supreme Court effectively collapsed any hypothetical distinction between "factual" and "opinion" portions of expert reports, because only an author-analyst could testify to what they "knew or observed about the events his certification concerned, *i.e.*, the particular test and testing process he employed," and the testimony of a surrogate analyst could not "expose any lapses or lies on the certifying analyst's part."  564 U.S. at 661–62.  Instead, as the Court recently reaffirmed in *Smith v. Arizona*, for testimonial statements, "factual assertions" that "[i]f believed true" would "lead the jury to credit the opinion" of the testifying expert, fully implicate the Confrontation Clause.  607 U.S. at 796.

Other sections of *Bullcoming* make clear that the Confrontation Clause does not distinguish between "facts" and "opinions" contained in a forensic report.  For example, the *Bullcoming* Court noted that "[m]ost witnesses . . . testify to their observations of factual conditions or events, *e.g.,* 'the light was green,' 'the hour was noon.'"  564 U.S. at 660.  The Court queried whether — if one police officer observed the address of a home above the front door or a radar gun readout — another officer could testify to that information in court "so long as that officer was equipped to testify about any technology the observing officer deployed and the police department's standard operating procedures."  *Id.* at 660.  The answer, the Court stated, was "emphatically 'No.'"  *Id.* (citing *Davis*, 547 U.S. at 826).  Even though the Court held that the author-analyst certified more than a machine-generated number, it underscored that "the comparative reliability of an analyst's testimonial report drawn from machine-produced data does not overcome the Sixth Amendment bar."

*Id.* at 661. Instead, "the analysts who write reports that the prosecution introduces must be made available for confrontation even if they possess 'the scientific acumen of Mme. Curie and the veracity of Mother Teresa.'" *Id.* (quoting *Melendez-Diaz*, 557 U.S. at 319–20, n.6). Thus, whether a surrogate witness is testifying to ultimate "opinions" or mere "data," the author-analyst must be produced to satisfy the accused's right to confrontation. Surrogate testimony by another analyst who understands the procedures used to generate the data, clinical observations, or other findings in the report will not suffice.

Indeed, in Ganthier's case, the entire autopsy report could fairly be described as scientific "opinions." And Dr. Carver, as a surrogate witness for the absent Dr. Kanfer, relayed far more about the autopsy than just Dr. Kanfer's ultimate "cause of death" conclusion. As discussed further in Section III., *infra*, Dr. Carver relied heavily on Dr. Kanfer's own interpretations and observations of Koster's corpse. Those observations included Dr. Kanfer's measurement of the stab wound to Koster's liver, Tr. 8/8/2013, 492:1–3, 570; Autopsy Report at 1; Dr. Kanfer's observation of bleeding in Koster's belly cavity, Tr. 8/8/2013, 492:16–18; Autopsy Report at 4; Dr. Kanfer's observations of Koster's head, skull, and brain, Tr. 8/8/2013, 497:10–498:15; Autopsy Report at 2; Dr. Kanfer's observations (or lack thereof) of the ligament near Koster's liver, Tr. 8/8/2013, 524:11–525:13; and the toxicological results and x-rays included in Dr. Kanfer's final autopsy report. Tr. 8/8/2013, 493:10–495:2, 496:23–497:4, 501:3–22, 511:3–512:3; Autopsy Report at 6.

Second, even assuming *arguendo* that Ganthier waived his objection to the "opinion" portions of the autopsy report, there is no basis for this Court to reconstruct the scope of that waiver. There is nothing in the trial court record that indicates what portions of the report were considered "opinion" or "non-opinion." At oral argument, the parties could not provide a version of the report with any redactions, or confirm which part of the report may have been redacted before Dr. Carver testified. The parties' collective *assumption* was that the only "opinion" portion of the report that was initially excluded from trial was the final "cause of death" section on page 5, which is but one part of a single page in the 11-page autopsy report — but the parties agreed that the state court record does not definitively answer that question.[15] Thus, even if this Court construed the Appellate Division decision as finding a "waiver" by Ganthier's trial counsel to the "opinion" portion of the report, the purported waiver would only attach, at most, to the relatively short and cabined final cause of death section. Yet Dr. Carver's expert testimony discussed at great length and in extensive detail numerous other portions of the autopsy report and the autopsy materials. Thus, even assuming this Court were to agree with Respondent that defense counsel had partially waived his client's Confrontation Clause claim with respect to the "cause of death" finding on page 5 of the report, Ganthier would still be entitled to

---

[15] The autopsy report filed by Respondent is 11 pages, including certain attachments to Dr. Kanfer's report. Autopsy Report at 1–11. Additionally, photographs and x-rays, not counted in those 11 pages, were part of the autopsy report materials.

habeas relief based on the substantial Confrontation Clause violations caused by admitting the remainder of the report and Dr. Carver's testimony.

In sum, this Court finds that Ganthier did not waive his objection to the introduction of Dr. Kanfer's autopsy report, nor to Dr. Carver's testimony about the numerous scientific findings made by Dr. Kanfer. The Supreme Court made clear well before Ganthier's trial that both the so-called "opinion" and "non-opinion" sections of this report are all testimonial statements. The Appellate Division found his complete objection to the report and its contents was preserved, and the record reflects that Ganthier clearly lodged that objection, which the trial court denied on the merits.

## III. The Confrontation Clause Violation Was Not Harmless

Having held that Ganthier did not waive his Confrontation Clause objection to Dr. Kanfer's autopsy report, and that the introduction of that report without Dr. Kanfer's testimony was a violation of those rights, the Court must next determine whether the constitutional error was harmless. It was not.

Because the state appellate court reviewing Ganthier's conviction held that there was no constitutional error and did not issue an alternative holding on whether the alleged error was harmless, *see generally Ganthier*, 149 N.Y.S.3d (2021), this Court applies the test in *Brecht v. Abrahamson* to determine if the error was harmless: whether the error "had substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. at 623, 637. That test applies "[b]ecause of

the deference we afford to state courts[.]" *Alvarez*, 763 F.3d at 232–33.[16]  The *Brecht* standard "asks only whether a federal habeas court *itself* harbors grave doubt about the petitioner's verdict." *Brown v. Davenport*, 596 U.S. 118, 136 (2022).

Under this test, the Supreme Court has outlined certain factors that can determine whether an error is harmless, "includ[ing] the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).

Where improperly admitted evidence "clearly bore on an essential issue" or was otherwise "crucial to the prosecution's case," the error is not harmless. *Hernandez v. McIntosh*, --- F. 4th ----, 2025 WL 2025555, at *15–16 (2d Cir. July 21, 2025) (holding that improper jury instruction regarding defendant's statements to law enforcement satisfied the *Brecht* standard where case "hinged entirely" on defendant's alleged confessions to murder, jury sent three notes relating to those statements, and

---

[16] In contrast, where, unlike here, the state court *does* make a merits determination on harmless error, that "qualifies as an adjudication on the merits under AEDPA," and a federal court in evaluating the habeas petition applies a two-part standard. *Brown v. Davenport*, 596 U.S. at 118, 127. First, the court must query whether the error had a "substantial and injurious effect or influence in determining the jury's verdict," which is the test laid out in *Brecht v. Abrahamson*, 507 U.S. at 619, 637. *See Brown*, 596 U.S. at 127. Second, the court must query whether the AEDPA standard has been met — whether "every fairminded jurist would agree that the error was prejudicial," *Brown*, 596 U.S. at 136, that is, whether "every fairminded jurist would harbor at least a reasonable doubt that the error was harmless." *Hernandez v. McIntosh*, --- F. 4th ----, 2025 WL 2025555, at *14 (2d Cir. July 21, 2025).

prosecution's case relied on credibility of statements); *Raheem v. Kelly*, 257 F.3d 122, 142 (2d Cir. 2001) (holding that improperly admitted identification testimony was not harmless because it bore on identity of shooter and prosecution offered no other evidence tying defendant to alleged crime); *cf. Perkins v. Herbert*, 596 F.3d 161, 177–78 (2d Cir. 2010) (holding evidence improperly admitted in violation of Confrontation Clause was harmless because evidence was cumulative of strong and properly admitted evidence, including explicit oral confession from defendant). The centrality of improperly introduced evidence to a prosecution's case, including the extent to which it is featured in opening and closing arguments, can contribute to a finding that the error was not harmless. *Brown v. Keane*, 355 F.3d 82, 92 (2d Cir. 2004) (holding 911 call admitted in violation of defendant's Confrontation Clause rights was not harmless because "prosecutor explicitly argued to the jury in her summation that the 911 tape corroborated the officers' testimony" that defendant fired gun, "trial judge's charge to the jury expressly called attention to the tape," and 911 tape "was the only disinterested evidence on th[e] crucial issue" of whether defendant fired gun). Other Courts of Appeals have found Confrontation Clause errors non-harmless in similar circumstances. *See, e.g., Issa v. Bradshaw*, 904 F.3d 446, 460 (6th Cir. 2018) (holding that introduction of statements in violation of Confrontation Clause was not harmless in part because statements were "important to the prosecution's case," evidenced by the prosecution's use of the statements in summations and prosecution's characterization of statements as "the cornerstone of this . . . investigation," and because statements were "the only direct evidence" implicating defendant in murder

for hire); *Brumley v. Wingard*, 269 F.3d 629, 646 (6th Cir. 2001) (holding not harmless admission of videotaped deposition in violation of Confrontation Clause because deposition was "the key piece of evidence" and deponent was the prosecution's "principal witness" (internal quotation marks omitted)); *Shaw v. Collins*, 5 F.3d 128, 132–33 (5th Cir. 1993) (holding not harmless admission of videotaped testimony in violation of Confrontation Clause because testimony "was the linchpin in the State's case").

At Ganthier's trial, both the autopsy report and Dr. Carver's testimony about the report unquestionably "bore on [the] essential issue" in dispute — Koster's cause of death — and were "crucial to the prosecution's case." *Raheem*, 257 F.3d at 142. Relying on the report, Dr. Carver testified that the cause of Koster's death was stabbing, and offered a detailed rebuttal to the defense's theory that Koster died from blunt force trauma caused by an accidental fall and possible drug overdose. Dr. Carver's "opinions" were inextricably based on the report's observations, findings, and conclusions in myriad ways. For example, Dr. Carver testified that Koster sustained a single stab wound of 1.5 centimeters to her liver, based on the autopsy report's finding that "[t]here is a stab wound to the left lobe of the liver, which is approximately 1.5 cm in greatest dimension." Tr. 8/8/2013, 492:1–3, 570; Autopsy Report at 1. He testified that he was confident that the liver injury occurred while Koster was alive, relying on the autopsy report's statement that there was bleeding in Koster's belly cavity. Tr. 8/8/2013, 492:16–18; *see* Autopsy Report at 4 (noting amount of fluid blood within the stomach). He testified that Koster's neck injuries

were fatal and occurred prior to Koster's death, because of the depiction of air (the "C-sign") he observed in the autopsy x-rays.  Tr. 8/8/2013, 493:10–495:2, 496:23–497:4.  He testified that Koster did not suffer a significant head injury, relying on the autopsy report's "short laundry list of things you would want to know to make that diagnosis" and its indication that those signs were absent, including no notes of skull fractures or swelling of Koster's brain.  Tr. 8/8/2013, 497:10–498:15; *see* Autopsy Report at 2 (listing observations from Koster's head and brain).  He testified that Koster's liver injury was not an "in-between blunt injur[y]" that could occur from a trauma like falling on dumbbells because the autopsy report did not indicate damage to the neighboring ligament.[17]  Tr. 8/8/2013, 524:11–525:13.  Finally, he testified that the toxicological results were negative for cocaine, OxyContin, Vicodin, and heroin, and that her blood alcohol level content was not higher than 0.02, relying on the toxicology results in the autopsy report.  Tr. 8/8/2013, 501:3–22, 511:3–512:3; *see* Autopsy Report at 6.

Here, as in other cases where Confrontation Clause errors were not found harmless, the prosecutor "explicitly argued to the jury in her summation," *Brown*, 355 F.3d at 92, that the report and Dr. Carver's testimony refuted Ganthier's defense theory about Koster's accidental death *and* proved the prosecution's claim that Ganthier caused her death by stabbing her.  *See, e.g.,* Tr. 8/28/2013, 11–16, 19–31, 40, 50; *see Issa*, 904 F.3d at 460 (citing prosecution use of evidence in summation in

---

[17] On cross-examination, Dr. Carver acknowledged that it was possible for a blunt force trauma to the liver to occur without damaging the ligament near the liver. Tr. 8/9/2013, 640:6–641:4.

harmless error analysis).  Though the prosecution also argued that the circumstantial evidence of how Ganthier sought to obscure and dispose of Koster's body, and Ganthier's actions to divert attention away from him by texting Koster's family, showed consciousness of guilt, the autopsy report remained the People's key evidence on Koster's cause of death.  And as the jury learned at trial, the police dropped the charges against Ganthier after his initial arrest pending the results of the final autopsy report — even though he had already admitted to cutting, burning, and disposing of Koster's body — which further reflects the centrality of the autopsy findings to Ganthier's prosecution on murder charges.

Lest there be any question whether the introduction of the report "had a substantial and injurious effect or influence in determining the jury's verdict," *Alvarez*, 763 F.3d at 232–33, the Second Circuit's harmless error analysis in *Garlick* is directly on point.  For in *Garlick*, as here,

> [t]he unreasonably erroneous admission of the autopsy report at Garlick's trial was not harmless. At trial, the State . . . heavily relied on it in its opening and closing statements. . . . No other medical evidence was offered at trial to establish the cause and manner of the victim's death. . . . The autopsy report was the strongest evidence in the State's case and was not cumulative of other inculpatory evidence connecting Garlick to the victim's death.
>
> Dr. Ely, who did not conduct or even participate in the autopsy, could not testify with respect to the procedures and methods that were followed in reaching its conclusions or to the qualifications of the examiner. Even rigorous cross-examination of Dr. Ely could not have adequately revealed any defects in the autopsy's methods, conclusions, and reliability.

1 F.4th at 136.

For these reasons, Ganthier has met his burden of showing that the violation of his Confrontation Clause rights at trial was not harmless, and he is entitled to relief from his conviction.

Finally, because the Court grants relief and a new trial on Ganthier's Confrontation Clause claim, it need not and does not reach his alternative ground for relief: that he was denied effective assistance of counsel when, *inter alia*, his trial counsel failed to present the former Chief Medical Examiner of Suffolk County as a defense witness to provide affirmative support for the defense's cause-of-death theory.

*         *         *

This Court recognizes that granting habeas relief will reopen this tragic case more than a decade after a Suffolk County jury convicted Evans Ganthier of Rebecca Koster's murder.  It will no doubt cause additional pain to Koster's survivors, and if the case proceeds to a second trial, impose additional burdens on the courts and taxpayers of Suffolk County.  That impact cannot be understated here, where Koster's loved ones have already suffered not just her untimely death, but also have long lived with the knowledge of how Ganthier covered up her death in the days that followed. For while Ganthier has long denied that he murdered Ms. Koster and claims that he panicked after she died accidentally in his presence, he has admitted that he failed to report her death, knowingly misled her family about her whereabouts, and mutilated her corpse in a failed attempt to disguise her identity.

64

Nevertheless, the right to confront witnesses at a criminal trial is one of our nation's bedrock constitutional guarantees. As the Supreme Court has repeatedly underscored, it protects not only individual defendants who may be wrongly accused, but the integrity of our adversarial system of justice.

The Court also finds itself compelled to note that this result was not inevitable. Dr. Kanfer, who performed the autopsy, was alive, well, and still employed by the OCME at the time of Ganthier's trial in July and August 2013. Although the lead prosecutor told the Court that it was her understanding that Dr. Kanfer had a vacation planned for at least some portion of the month of August, his supervisor, then Chief Medical Examiner Dr. Harold Wayne Carver, testified that he was unaware of any vacation, illness, or other reason why Dr. Kanfer was unavailable to testify directly about his own autopsy findings. In any event, rather than seek a brief adjournment or leave to take Dr. Kanfer's testimony out of order to avoid a conflict with his vacation plans (if any), the prosecution instead took an impermissible end-run around the Confrontation Clause. Perhaps prosecutors incorrectly believed that a redacted version of the autopsy report could be introduced as a "business record" under New York law notwithstanding Supreme Court precedent to the contrary, and made a strategic determination that Dr. Carver, who observed what he claimed were certain indicia of pre-mortem stab wounds that were not noted in Dr. Kanfer's report, would be more likely than Dr. Kanfer to persuade the jury that Koster's death was a homicide. Or perhaps they did not want to burden themselves, the trial court, or other witnesses with a brief adjournment of the trial date once Dr. Kanfer's alleged

scheduling conflict came to light.  Regardless, the prosecution's decision to proceed without the testimony of the person who performed Rebecca Koster's autopsy, and to instead rely on a surrogate witness who played no role in it, was a clear violation of Supreme Court precedent and infected Ganthier's trial with serious constitutional error.  And it leaves this Court with no choice but to vacate Ganthier's conviction and order a new trial.

**CONCLUSION**

For the reasons outlined herein, Ganthier's claim for habeas relief under the Sixth Amendment's Confrontation Clause is GRANTED.  This matter is remanded to the Supreme Court of Suffolk County for a new trial.

SO ORDERED.

*/s/ Nina R. Morrison*

NINA R. MORRISON
United States District Judge

Dated:  August 26, 2025
        Brooklyn, New York